Filed 6/30/26  In re Dixon CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| In re ROBERT JOE DIXON, JR., on Habeas Corpus. | A173772 <br><br> (Solano County <br> Super. Ct. No. FCR277399) |

In this habeas corpus proceeding, Robert Joe Dixon, Jr. seeks to overturn two 2012 convictions for attempted murder on the ground that his jury was given a kill zone instruction invalidated by *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).  The Attorney General concedes that the instruction given was "functionally identical" to the instruction disapproved in *Canizales* but argues that, unlike in *Canizales*, it was not reasonably likely that the jury misunderstood the instruction because the prosecutor correctly argued the kill zone theory.  Alternatively, the Attorney General argues that any error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)  We conclude that the jury was not properly instructed on the kill zone theory but that the error was not prejudicial.  Accordingly, we deny the petition.

## BACKGROUND

In January 2012, Dixon was convicted of assault with a firearm on Samuel King (Pen. Code, § 245, subd. (a)(2)) (count 1); first-degree murder of

1

Kevin Domino (§ 187, subd. (a)) (count 2); premeditated attempted murder of Kristopher Battle and Jamal Williams (§§ 187, subd. (a), 664) (counts 3 and 4, respectively); shooting at an inhabited dwelling (§ 246) (count 5); and various firearm enhancements. Dixon was sentenced to prison for a determinate term of 24 years, 4 months, on counts 1 and 5, and an indeterminate consecutive term of 110 years to life, plus four life terms with possibility of parole, on the remaining three counts. (*People v. Dixon* (A140051, Oct. 3, 2017) [nonpub. opn.].)

In this court's prior decision affirming Dixon's convictions, we summarized the relevant facts as follows:

"In February 2010, defendant was dating a woman named Denitrice Thomas, who lived in the Parkway Gardens complex in Fairfield. Defendant sold marijuana, and he kept marijuana and money at Thomas's residence. One Friday evening, Thomas was the victim of a home invasion. Three men wearing hoodies broke into Thomas's residence while Thomas was there with two friends and stole various items, including a laptop computer and a video game console. Thomas had more than $1,000 in cash belonging to defendant in her apartment at the time and marijuana. She called defendant right away to tell him about the incident. Defendant responded that he would find out who did it and take care of it." (*People v. Dixon, supra*, A140051 at p. *2.)

On February 9, 2010, "Jamal Williams, his cousin Kevin Domino, and Kristopher Battle were outside the Parkway Gardens complex where Williams's grandmother lived, drinking and listening to music. Thomas pulled up in a car with defendant in the passenger seat, and defendant called Williams over to talk. Defendant asked Williams whether he knew anything about the home invasion, but Williams did not offer any information and suggested defendant might have to pay for information. Defendant

2

reportedly became upset, pulled a gun, began waving it around, and said 'I got it for whoever wants it' or words to that effect.  Frightened by this behavior and concerned Williams might also have a gun, Thomas drove off.

"As Thomas drove, defendant made a telephone call and Thomas heard him say, 'These guys know something' and 'we got to take care of this.' Thomas and defendant then picked up co-defendant Raymon Sellers, and defendant handed Sellers a (second) gun.  Shortly afterward, defendant directed Thomas to drive back towards the Parkway Garden complex.  On the way, Williams telephoned Thomas, but defendant took the phone, and began arguing with Williams. Eventually, defendant had Thomas pull into a parking lot at one end of the Parkway Garden complex.  He and Sellers got out of the car, leaving their hats and other personal items, but carrying the guns, and took off running.

"During this period, Williams, Domino, and Battle had remained outside Williams's grandmother's residence.  Suddenly, they heard gunshots. Williams was near the door of the residence and dove inside, escaping injury, although one bullet hit a washing machine inside the dwelling.  Battle was shot, but managed to run from the scene, and survived.  Domino was shot and died at the scene." (*People v. Dixon, supra*, A140051 at pp. *3–4.)[1]

## DISCUSSION

## I.

Dixon contends his attempted murder convictions must be reversed because the jury was given a kill zone instruction that the California Supreme Court determined in *Canizales, supra*, 7 Cal.5th at pages 607 to 609

---

[1] Samuel King was shot by Dixon on February 8.  (*People v. Dixon, supra*, A140051 at pp. *2–3.)  The facts of the shooting are not relevant to this proceeding.  Dixon's request for judicial notice of the records in appeal numbers A169449 and A140051 is granted.

to be legally inadequate.  The jury was instructed pursuant to the then-current version of CALCRIM No. 600 as follows:  "As to Count 3, a person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict a defendant of the attempted murder of Kristopher Battle, the People must prove that the defendant not only intended to kill Jamal Williams but also either intended to kill Kristopher Battle, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Kristopher Battle or intended to kill Jamal Williams by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Kristopher Battle."

In *Canizales*, the jury was instructed with essentially the same version of CALCRIM No. 600 given here.  (*Canizales, supra*, 7 Cal.5th at p. 601 & fn. 3.)  The court explained that the instruction was flawed because it did not adequately define the term "kill zone" and failed to direct the jury to consider the circumstances of the attack in determining whether the defendant's attempt to kill everyone around the primary target was undertaken as a means of killing the primary target.  (*Id*. at pp. 607, 609.)  The Court explained that the kill zone theory "may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death . . . and (2) the alleged attempted murder victim [who was a secondary target] was located within that zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary

4

target and everyone within the zone of fatal harm." (*Canizales, supra,* 7 Cal.5th at p. 607.) The court held that "when a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here." (*Id.* at p. 609.)

The court emphasized "that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales, supra,* 7 Cal.5th at p. 608; see also *People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*) ["The . . . commonplace act of firing one or a few shots at a group may supply the actus reus for a number of crimes. But, standing alone, it does not support a conclusion that the shooter intended to create a kill zone around the primary target in order to ensure that the primary target will die"].)

As amended after *Canizales*, CALCRIM No. 600 reads in relevant part:

"A person may intend to kill a primary target and also [a] secondary target[s] within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

5

"In order to convict the defendant of the attempted murder of *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>*, the People must prove that the defendant not only intended to kill *<insert name of primary target alleged>* but also either intended to kill *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>*, or intended to kill everyone within the kill zone.

"In determining whether the defendant intended to kill *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>*, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>* was located within the kill zone.

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:

"[• The type of weapon used . . .

"[• The number of shots fired . . .

"[• The distance between the defendant and *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>* . . .]

"[• The distance between *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>* and the primary target.]

"If you have a reasonable doubt whether the defendant intended to kill *<insert name or description of victim charged in attempted murder count[s] on*

6

*concurrent-intent theory>* or intended to kill *<insert name or description of primary target alleged>* by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>*.]"

In *In re Rayford* (2020) 50 Cal.App.5th 754, 770, disapproved on other grounds in *Mumin, supra*, 15 Cal.5th at page 203, the court held that *Canizales* applies retroactively to cases that were final when the decision issued because it substantively changed the law on the kill zone theory.

In *Mumin, supra*, 15 Cal.5th at page 200, the court reiterated that in deciding whether to give the instruction, the trial court considers whether substantial evidence exists from which the jury could draw the required inference—that the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone. "If so, the instruction is justified. Ultimately, it remains for the jury to determine whether that inference is the only reasonable one. The trial court may not preemptively substitute its view of the evidence for that of the jury." (*Ibid*.)

In these proceedings, Dixon does not argue that the evidence was insufficient to support the giving of the instruction. Nor does he dispute that the instruction correctly required the jury to find either that he intended to kill Battle or alternatively, intended to kill everyone within the kill zone. He argues, however, that the instruction was legally inadequate because it did not define the kill zone and did not require "the prosecution to prove that ' (1) the circumstances of the defendant's attack on a primary target . . . are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm.' " Without such language, Dixon suggests, "the kill zone instruction is hopelessly inadequate and defective."

7

To determine whether this instruction was erroneous, we evaluate whether there was a reasonable likelihood the jury understood the instruction in a legally impermissible manner. (*Mumin*, *supra*, 15 Cal.5th at p. 210; *Canizales*, *supra*, 7 Cal.5th at p. 613.) *Canizales* directs us to consider both the language of the instruction and counsels' argument to the jury. (*Canizales*, at p. 613.)

Here, the prosecutor argued first that based on "the number of shots" and where the victims and bullet casings were found, the jury could conclude that Dixon and his co-defendant "went over to kill all of them." Then she argued, "Now, if you find, though, the jury instruction will tell you that, say you think, 'Well, he only—they only went over there really to kill Jamal, because Jamal is the person who he had the beef with, because he didn't like the answer that he got from Jamal Williams . . ., the law tells you that even if he went over there to kill Jamal, that they can still be convicted of attempted murder of Kristopher Battle if you find that he intended to kill everyone in this, like, basically, kill zone. If a defendant creates a kill zone, meaning, 'I don't shoot somebody one time, but I continue to shoot and shoot and shoot at the small little group and there's three people in that group', yeah, you can assume they meant to kill everyone when they didn't stop shooting, and that's exactly what occurred here, because of the number of shots in the little, small vicinity of where they were at the time that all those shots were fired, and you can infer that they intended to kill all three of them that were right there."

The Attorney General contends that there is no reasonable likelihood that the jury understood the instruction in a legally impermissible manner because the prosecutor in petitioner's case correctly argued the kill zone theory and "emphasized that the jury had to find that petitioner had to

intend to kill everyone in the kill zone and directed the jury to consider the evidence of petitioner's attack in determining whether petitioner had intended to kill everyone in that zone." (Italics omitted.) The Attorney General argues that "[t]he prosecutor's argument, and the circumstances of petitioner's offense, removed any ambiguity in the instruction by emphasizing that the jury must find that petitioner had intended to kill everyone in the kill zone." (Italics omitted.)

While the prosecutor correctly argued that the jury has to find that Dixon had an intent to kill everyone in the kill zone and that the jury "can infer" that intent from the circumstances of the shooting, the argument still lacked the further qualification that such an inference is permissible only where it is the *only* reasonable inference that can be drawn from the circumstances of the shooting. In *Canizales, supra*, 7 Cal.5th at pages 606 to 607, the court expressly addressed this issue. The Court explained that while CALCRIM No. 225 properly instructs on the use of circumstantial evidence to establish intent,[2] "[a]s past cases demonstrate . . . even when a jury is otherwise properly instructed on circumstantial evidence and reasonable doubt, the potential for misapplication of the kill zone theory remains troubling."

Accordingly, the instruction given in this case, even in the context of the prosecutor's argument, was legally inadequate insofar as it failed to

---

[2] CALCRIM No. 225 instructs that circumstantial evidence may support required intent if "the only reasonable conclusion supported by the circumstantial evidence" is that defendant had the required intent, and that jury must conclude intent was not proved when there are "two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports" a determination that defendant did not have the required intent.

9

advise the jury of all the limitations on the use of circumstantial evidence to infer intent within the context of the kill zone theory.

## II.

Because the jury was instructed on two alternate theories of liability, one legally valid (intent to kill) and one legally invalid (kill zone/concurrent intent to kill), "[t]he Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt." (*In re Lopez* (2023) 14 Cal.5th 562, 585 (*Lopez*); *Mumin, supra*, 15 Cal.5th at p. 207.) To find the error harmless, this court must conclude that "any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed." (*Lopez*, at pp. 584–585.)

## A.

Any error in the kill zone instruction was not prejudicial as to Dixon's conviction on count 4 for the attempted murder of Williams. The instruction given in this case did not permit the jury to decide guilt based on the kill zone theory as to Williams. It specifically says it applies "as to count 3." Moreover, the jury was instructed that Williams was the primary target of any "kill zone," and that the jury had to find that defendant intended to kill the primary target. Accordingly, Dixon could not have been prejudiced as to the count involving Williams.

## B.

For different reasons, the error was not prejudicial as to Dixon's conviction under count 3 of the attempted murder of Battle. The Attorney General contends that the error was harmless because "[t]he prosecutor's argument made clear that Battle had to be within the kill zone" and that "the evidence was overwhelming that petitioner had intended to kill Battle." The Attorney General argues that Dixon "had a motive to attack the group for

10

having robbed Thomas, had prior contact with the group, and had arranged to return to the group with two other people and guns, shooting more than a dozen times at the front porch where the three victims were sitting. The bullets all struck nearby, including one that killed Domino and another that hit Battle. . . . In light of that overwhelming evidence that petitioner had intended to kill all three people in the small area of the porch, no rational properly instructed jury would have acquitted petitioner." Dixon contends, however, that conflicts in the evidence as to the victims' locations and his ability to see all of the victims create a reasonable doubt as to whether he intended to kill all three men. He suggests that the trial evidence also supported a reasonable alternative inference that he intended to kill only Williams, but in carrying out that intent he callously and recklessly endangered others.

Neither party cites to the trial transcript in a manner that would guide an " 'exhaustive[ ] review[ ]' of the trial evidence" required by this court. (See *Lopez, supra,* 14 Cal.5th at p. 590, fn. 8; see also *id.* at p. 568 ["a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well"].) Nonetheless, having undertaken our own examination of the trial record, we conclude that a rational jury, which found Dixon guilty under the instructions given, necessarily would have found him guilty had it been properly instructed.

11

Initially, we acknowledge that the trial evidence is inconclusive regarding Dixon's motive. In the direct appeal, this court found that "there was evidence suggesting defendant had a motive to kill all three men—Williams, Battle and Domino—because he suspected they were involved in the robbery at Thomas's apartment" and that he said that "these guys"—not just Williams—knew something about the prior break-in. (*People v. Dixon, supra,* A140051 at pp. *57–58.) However, as Dixon argues, the trial testimony shows that before the shooting he spoke only to Williams while in the car and Williams called Thomas on the phone afterward and said, "what's your problem bringing this dude with this gun up to us?" A police witness testified that Dixon reported hearing Williams tell Thomas on the phone something like, "Tell your boyfriend he better not come back over here." Williams's grandmother was Thomas's neighbor. Williams testified that he saw Thomas and Dixon the morning of the day that the robbery occurred. In closing arguments, the prosecution emphasized that during Dixon's conversation with Williams before the shooting, Dixon said " 'I know you know what happened. You live right here []. You live right in back of us.' " Finally, the kill zone instruction identified Williams as the target. Based on this evidence, a reasonable jury could have concluded either that Dixon specifically intended to kill all three men or that Williams was Dixon's target. Accordingly, we do not believe that the motive evidence alone is determinative of prejudice in this case.

In his direct appeal, Dixon identified as a central dispute "whether there is substantial evidence that all three alleged victims in counts 2, 3 and 4 (Domino, Battle, and Jamal Williams) stood together at the porch when the gunshots were fired, a claim the People make as essential to their 'kill zone' theory." The closing arguments indicate, however, that this was not a central

12

dispute at trial. As set forth above, the prosecutor argued that all three men were in a "small little group" or all in the same "little, small vicinity." Defense counsel did not dispute this characterization in closing and touched on the kill zone instruction only very briefly.

At trial, Battle testified that, in front of the home, there is grassy area with a walkway and "a step up" to what Battle described as a porch. Battle testified that Williams and Domino were standing next to each other at the time of the shooting. Williams was on the porch and Domino was on the walkway in the front area next to the door. It is difficult to determine from Battle's testimony where he was standing, other than it was in the grassy area by the walkway. When he heard the gunshots, he ducked and ran away from the home, at which time he could still see Domino in his peripheral vision but not Williams.

Williams testified that he was on the concrete, one step from the front door of the residence, when he heard the gunfire. Domino "was trailing, coming from the vehicle" but "about at the front door" and Battle was right next to Williams. After the shooting, he looked out the front door and he saw Domino's shoe "right in front of the door." Domino's body was lying in the grassy area outside the door.

Police witnesses testified to finding bullet holes in the front wall of the residence, near the security screen door, a couple near a window, one in a door frame, and some inside the home. The crime investigator testified that after Domino's body was removed, his jacket and some medical-type instruments were photographed "directly in front of the apartment."

Battle testified that the lighting was "not very good" near where the car was parked but that the residence had a light and there was a street light

13

nearby. Williams testified that it was "dark, pitchy-dark, black" at the time of the shooting but also that there was a light over the residence.

In Dixon's direct appeal, this court reviewed this evidence and concluded that "[a]lthough not entirely clear," the testimony relied on by Dixon "does not establish that Battle stood significantly apart from the other two men." (*People v. Dixon, supra*, A140051 at pp. *66–67.) We agree. With respect to the lighting at the time of the shooting, this court concluded: "Although defendant notes that it was dark outside, the residence had a light and there was a street lamp. Defendant does not dispute that Williams was visible standing outside the residence and, if Williams was visible, the jury could infer his two companions were visible as well." (*People v. Dixon*, at p. *58.) Again, we agree.

On this evidence, a rational jury would have found Dixon guilty of the attempted murder of Battle even if the instruction had included the additional requirement that the only reasonable inference from the circumstances of the offense is that Dixon intended to kill everyone in the zone of fatal harm. The jury instruction now identifies several circumstances which may be considered in determining whether a defendant intended to create a kill zone, including the type of weapon used, the number of shots fired, the distance between the defendant and the victim and the distance between the victim and the target. The evidence on these factors is, as set forth above, not in conflict and points to a single, rational inference. Accordingly, we find the instructional error harmless.

## DISPOSITION

The petition for habeas corpus is denied.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J. *

---

*Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.